UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
QUILLIAN VIRGIL,

Plaintiff,

<b><u>MEMORANDUM & ORDER</u></b>

- against -                                          19-CV-1473 (PKC)

ANDREW SAUL, Commissioner of Social
Security,[1]

Defendant.
-----------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Quillian Virgil brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 9, 12.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. (Plaintiff's Brief ("Pl.'s Br."), Dkt. 10, at 24.) The Commissioner seeks affirmation of the denial of Plaintiff's claims. (Defendant's Brief ("Def.'s Br."), Dkt. 13, at 24.) For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The case is remanded for further proceedings consistent with this Order.

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, and pursuant to Federal Rule of Civil Procedure 25(d) is substituted as Defendant in this action. The Clerk of Court is respectfully directed to update the docket accordingly.

## BACKGROUND

### I.    Procedural History

On September 4, 2015, Plaintiff filed an application for DIB, alleging disability beginning on June 18, 2015.  (Administrative Transcript ("Tr."[2]), Dkt. 8, at 254.)  On January 26, 2016, Plaintiff's claim was denied.  (*Id.* at 104.)  On February 1, 2016, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ") (*id.* at 116), and, on January 31, 2018, appeared with counsel before ALJ Patricia M. French (*id.* at 31).  In a decision dated April 2, 2018, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act") from the alleged onset date of June 18, 2015 through the date of the ALJ decision.[3]  (*Id.* at 11–13.)  On January 15, 2019, the ALJ's decision became final when the Appeals Council of the SSA's Office of Disability Adjudication and Review denied Plaintiff's request for review of the decision.  (*Id.* at 1–3.)  This appeal timely followed.[4]

---

[2] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[3] The ALJ also considered the claimant's earnings records and determined that Plaintiff "has acquired sufficient quarters of coverage to remain insured through December 31, 2017.  Thus, the [plaintiff] must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  (Tr. at 20.)  That portion of the decision was not appealed by Plaintiff.  (*See generally* Pl.'s Br., Dkt. 12-1.)

[4] Under Title 42, United States Code, Section 405(g):

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to

## II.    The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  The claimant

bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden

in the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).  First,

the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(i).  If the answer is yes, the claimant is not disabled.  *Id.*  If the answer is

no, the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe"

impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is determined to be severe when it

"significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.*

§ 404.1520(c).  If the impairment is not severe, then the claimant is not disabled within the meaning

of the Act.

In this case, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity

since June 18, 2015, the alleged onset date."  (Tr. at 16.)  The ALJ also found that Plaintiff had the

following severe impairments: degenerative disc disease, degenerative joint disease (bilateral

knees), flat foot deformity, status-post bilateral patella tendon repairs secondary to rupture, post-

traumatic chondromalacia bilateral patellae,[5] traumatic osteoarthritis bilateral patellofemoral

---

the contrary."  *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at
*3 (E.D.N.Y. Mar. 27, 2015) (citing, *inter alia*, 20 C.F.R. §§ 404.981, 422.210(c)).  Applying this
standard, the Court determines that the request was timely, as Plaintiff received the
Commissioner's final decision on January 20, 2019 and filed the instant action on March 14,
2019—53 days later.

    [5] Chondromalacia patella is an

    abnormal softening of the cartilage of the underside [of] the kneecap (patella).  It is
    a cause of pain in the front of the knee (anterior knee pain).  Chondromalacia patella
    is one of the most common causes of chronic knee pain.  Chondromalacia patella
    results from degeneration of cartilage due to poor alignment of the kneecap (patella)

joints,[6] herniated nucleus pulposus with left sciatic radiculopathy,[7] plano valgus[8] with subtalar and talonavicular synovitis, and plantar fasciitis.  (*Id.*)  The ALJ determined that Plaintiff's asthma secondary to 9/11 World Trade Center exposure was a non-severe impairment. (*Id.* at 16–17.)

Having determined that Plaintiff had satisfied his burden at the first two steps, the ALJ proceeded to the third step and determined that none of Plaintiff's impairments met or medically equaled the severity of any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), including §§ 404.1520(d), 404.1525, and 404.1526.  (*Id.* at 17.)  The ALJ specifically considered and rejected the application of Listings 1.02 (dysfunction of major joint) and 1.04 (disorders of the spine) to Plaintiff's impairments.  (*Id.*)  Moving to the fourth step, the ALJ found

---

as it slides over the lower end of the thighbone (femur).  This process is sometimes referred to as patellofemoral syndrome.

*Yaris v. Colvin*, No. 14-CV-551 (JTC), 2016 WL 824446, at *5 n.5 (W.D.N.Y. Mar. 3, 2016) (internal quotation marks and citation omitted).

[6] Traumatic osteoarthritis is "[a]rthritis characterized by erosion of articular cartilage, either primary or secondary to trauma[,] . . . which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result."  *Osteoarthritis*, Stedman's Medical Dictionary 637280 (Nov. 2014).  To become "eburnated," bone or cartilage becomes "hard and dense like ivory."  *Eburnated*, Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical/eburnated (last visited Sept. 21, 2020).

[7] "A herniated nucleus pulposus is a slipped disk along the spinal cord."  *Corson v. Astrue*, 601 F. Supp. 2d 515, 526 n.29 (W.D.N.Y. 2009) (citation omitted).

[8] Plano valgus is "[a] condition in which the longitudinal arch of the foot is flattened and the hindfoot is everted."  *Planovalgus*, Stedman's Medical Dictionary 693700 (Nov. 2014).

that Plaintiff maintained the residual functional capacity ("RFC")[9] to perform "light work,"[10] as

defined in 20 C.F.R. § 404.1567(b), except that:

> the workplace must not permit exposure to extremes of hot, cold, or humidity, and
> it must not expose the claimant to concentrations of dust, fumes, smoke, gases, or
> other pulmonary irritants.  The claimant must have the opportunity to stretch or
> change positions, such as with the freedom of a sit-stand option, throughout the day
> at his discretion and for his comfort.  He should only occasionally operate left foot
> controls and only occasionally reach overhead bilaterally.  Because of symptoms
> of pain, he can be expected to be off task up to 10% of the workday in addition to
> regular breaks.

(*Id.*)  The ALJ then proceeded to step five to determine whether Plaintiff—given his RFC, age,

education, and work experience—had the capacity to perform other substantial gainful work in the

national economy.  The ALJ determined that Plaintiff was unable to perform his past relevant work

as a police officer with the New York City Police Department ("NYPD"), a position from which

he retired with Accident Disability in February 2015.  (Tr. at 24, 345.)  However, the ALJ found

that given Plaintiff's RFC, age, education, and work experience, he could make the adjustment to,

and perform work as, a hand packager/inspector, price marker, and/or mail sorter.  (*Id.* at 25.)

---

[9] To determine a plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and
any related symptoms … [which] may cause physical and mental limitations that affect what [the
plaintiff] can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

[10] According to the applicable regulations,

[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls.  To be considered capable of performing a full or
wide range of light work, you must have the ability to do substantially all of these
activities.  If someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (*Id.* at 26.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C. § 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera*, 697 F.3d at 151 (internal quotation marks omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted).  "In determining whether the [Commissioner]'s findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.*  (internal quotation marks omitted).  However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

Plaintiff contends that the ALJ (1) improperly applied the treating physician rule and Social Security Regulations, (2) erred in determining that Plaintiff's asthma did not meet the threshold severity, and (3) erred in her credibility assessment of Plaintiff.  (Pl.'s Br., Dkt. 10, at 11–12.)  The

Court agrees with Plaintiff's first argument[11] and remands this matter for further proceedings consistent with this Memorandum and Order.

## I.     Weight of the Medical Evidence

In reaching her conclusions, the ALJ afforded "great weight" to the opinion of Consultative Examiner ("CE") Roopalekha Shenoy, M.D.; "no weight" to the opinion of Plaintiff's orthopedic surgeon, Raymond Shebairo, M.D.; "little weight" to the opinions of Plaintiff's treating orthopedist, Robert S. Goldstein, M.D.; "some weight" to the opinion of Plaintiff's physiatrist Russel H. Silver, M.D.; and "little weight" to the opinion of Plaintiff's internist, Colin Clarke, M.D.  (Tr. at 20, 22–24.)  Because the ALJ's allocation of weight to the medical evidence is not supported by the record, remand is warranted.

The SSA has mandated specific procedures an ALJ must follow when considering the weight to assign a treating physician's opinion.  *See* 20 C.F.R. § 404.1527.[12]  "[T]he opinion of a [plaintiff]'s treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (second citation and alterations omitted) (quoting 20

---

[11] For the reasons discussed *infra*, the Court is remanding this matter based on the ALJ's failure to properly weigh the medical evidence as it relates to Plaintiff's identified severe impairments, and need not consider Plaintiff's arguments regarding the severity of his asthma diagnosis, or the improper consideration of Plaintiff's testimony.  However, the Court instructs the ALJ, on remand, to further develop the record with respect to the severity of Plaintiff's asthma diagnosis so that the Agency may render an opinion based on a complete record.

[12] This principle is referred to as the "treating physician rule."  Although "[t]he current version of the [Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, as the current regulations only "apply to cases filed on or after March 27, 2017."  *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520(c).  Because Plaintiff's claim was filed on September 4, 2015 (Tr. at 254), the treating physician rule applies.

C.F.R. § 404.1527(d)(2)).  There are several factors that an ALJ must explicitly consider when weighing medical evidence.  As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion.  Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA]'s attention that tend to support or contradict the opinion.  The regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion.

*Halloran v. Barnhardt*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) (internal quotation marks and citations omitted); *see also Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019); *Burgess*, 537 F.3d at 129.  Furthermore, while an ALJ is entitled to disregard the opinion of a plaintiff's treating physician after providing the physician the opportunity to correct the deficiencies in her medical reports, the ALJ must make clear that this decision is based on conclusions made by other medical professionals.  *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." (citation omitted)); *Hilsdorf v. Comm'r of Soc. Sec*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citations omitted)).

On December 20, 2012, Plaintiff suffered a knee injury while working as an NYPD officer, and required emergency surgery to repair a bilateral patellar tendon rupture.  (Tr. at 340–41.)  Dr. Shebairo performed the procedure and diagnosed Plaintiff with "bilateral fractured patella, status post[]surgery with residual."  (*Id.* at 455–56.)  Plaintiff applied for Accident Disability Retirement

("ADR") on February 3, 2013, and was placed on restricted duty while working for the NYPD in a limited capacity outside of the field.  (*Id.* at 343, 348.)  To be eligible for ADR, an officer "must be in active service and be physically or mentally incapacitated for the performance of duty as the natural and proximate result of an accident sustained in active service and not caused by the member's own willful negligence."[13]  Based on Dr. Shebairo's diagnosis, the Medical Board determined that Plaintiff "would not be able to carry out [his] full duties [as] a New York City Police Officer" and approved his application on February 3, 2015.  (*Id.* at 343, 345.)  Dr. Shebairo then examined Plaintiff nineteen times between December 21, 2012 and September 1, 2015.  His treatment notes repeatedly documented Plaintiff's "persistent pain and weakness in both knees" (*id.* at 397–410), "difficulty climbing stairs" (*id.* at 406–07), "atrophy of the quadriceps" (*id.* at 397–98, 401–02, 405), and subluxation[14] of both patellas (*id.* at 397–400).  On September 1, 2015—approximately two and a half months after the alleged onset date of June 15, 2015—Dr. Shebairo again documented Plaintiff's pain in both knees, "continued subluxability of both patellas, atrophy of the quadriceps, and limited [range of motion,] as well as mild instability."  (*Id.* at 397.)  Dr. Shebairo opined that Plaintiff was "100% disabled."  (*Id.*)

Beginning on August 25, 2015, Robert S. Goldstein, M.D., assumed the role of Plaintiff's treating orthopedic physician.  (*Id.* at 495.)  Upon initial examination, Dr. Goldstein confirmed Dr. Shebairo's prior diagnosis of status post-operative bilateral patella tendon repairs secondary to

---

[13]    N.Y.C. Police Pension Fund, Tier 3 – Disability Retirements, https://www1.nyc.gov/html/nycppf/html/tier_3/tier_3_disability_retirement.shtml (last visited Sept. 7, 2020).

[14] Subluxation is "[a]n incomplete luxation or dislocation; although a relationship is altered, contact between joint surfaces remains."  *Subluxation*, Stedman's Medical Dictionary 859110 (Nov. 2014).

rupture. (*Id.* at 496.) That same day, Dr. Goldstein further diagnosed Plaintiff with "[p]ost[-]traumatic patellofemoral chondromalacia/osteoarthrosis bilateral knees, [h]erniated nucleus pulposus L4-5, L5-S1 with left sciatic radiculopathy,"[15] and "[p]ainful pes plano valgus deformity" on the left ankle and foot, "with inflammation of the left foot, tarsal navicular joint." (*Id.* at 500.) Dr. Goldstein reviewed an MRI of Plaintiff's lumbar spine on October 22, 2015, which confirmed the herniation of multiple disks, as described above. (*Id.* at 497.) MRIs of both knees taken on November 10, 2015 also revealed abnormalities. (*Id.* at 497–98.) In addition to reviewing these diagnostic images, Dr. Goldstein examined Plaintiff fourteen times over the course of more than two years, during which time his findings remained largely unchanged. (*Id.* at 497–25.) Dr. Goldstein repeatedly documented Plaintiff's bilateral knee pain, lumbar spine pain, and left ankle pain, as well as a limited range of motion in both knees, defects in the manipulation of the lumbar spine, swelling of both patellar tendons, and weakness in the left ankle. (*Id.* at 503–25.) Indeed, his most recent treatment note on November 8, 2017 indicated "bilaterally weak" quadricep muscles, "[s]welling over both patella tendons," "pain radiat[ing] down the left lower extremity," and a "defect in range of motion in flexion, extension lateral bending." (*Id.* at 503.) After each examination between August 15, 2015 and November 8, 2017, Dr. Goldstein prescribed Meloxicam, an anti-inflammatory medication, and recommended at-home strengthening exercises for quadriceps "as tolerated." (*Id.* at 503–25.) In November 2017, Dr. Goldstein opined that Plaintiff is limited to standing and/or walking "less than two hours," sitting "less than six hours,"

---

[15] "Radiculopathy refers to a condition of nerve root compromise and irritation giving rise to radiating extremity pain frequently coupled with muscle weakness, reflex depression, and specific sensory loss." The Claim Adjuster's Automobile Liability Handbook § 11:32—Orthopedic Analysis Orthopedic Assessment and Management of Accident-Related Conditions (Aug. 2019).

and "lifting and/or carrying objects weighing less than ten pounds up to one-third of an eight hour work day." (*Id.* at 501.)

After Plaintiff presented to internist Colin Clarke, M.D., on September 1, 2015 with complaints of bilateral knee pain and lower back pain, Dr. Clarke administered lidocaine trigger point injections on a bimonthly basis through November 28, 2017. (*Id.* at 150, 152, 186, 470–78.) Dr. Clarke's findings echoed the diagnoses of Dr. Shebairo and Dr. Goldstein, documenting evidence of bilateral traumatic patellar tendon rupture, status post-surgery, lumbar spine discopathy, and chronic left ankle sprain upon each of Dr. Clarke's sixteen examinations of Plaintiff over the course of thirty months. (*Id.* at 151–93.)[16]  Based on Dr. Clarke's clinical findings, he opined that:

> In a typical eight hour workday, [Plaintiff] is able to lift and carry less than 10 pounds and only for up to two hours.  He is unable to sit for longer than four hours cumulatively.  With respect to standing and walking, [Plaintiff] may do so for no more than one hour in an eight hour workday.  Additionally, [Plaintiff] can be expected to experience periods of exacerbation during which he will be absent from work.  Pain will distract him from his duties.

---

[16] For example, in his January 8, 2018 narrative report, Dr. Clarke described the findings of a November 28, 2017 physical examination of Plaintiff as follows:

> The patient rises from a chair with difficulty and walks with an unsteady gait.  He does not require assistance mounting the examination table but does so with some effort. . . .  Lumbar paraspinal muscles are tender and in spasm.  Deep tendon reflexes are absent in bilateral lower extremities.  Motor strength is symmetrically decreased on leg extension.  Sensation is mildly decreased in the L5 nerve distribution, left lower extremity.  Straight leg testing is positive []at 40 [degrees] bilaterally.  Examination of the knees reveals 12 cm vertical, linear surgical scars over the anterior aspect of the knees, bilaterally.  McMurray's test is positive bilaterally.  Mild diffuse swelling and tenderness is noted.  Crepitus is appreciated on knee extension, bilaterally.  The left ankle shows swelling along the lateral aspect.  Tenderness is elicited on palpation.  Range of motion in bilateral knees and left ankle is decreased in flexion and extension.  Low back range of motion is decreased in flexion, extension, rotation, and lateral flexion.

(Tr. at 151.)

(*Id.* at 152.)

Physiatrist Russell Silver, M.D., also treated Plaintiff for bilateral knee pain, low back pain, and left ankle pain between October 16, 2015 and December 8, 2017, and administered guided and trigger point injections in the lumbar spine and bilateral knees.  (*Id.* at 546–52.)[17]  Dr. Silver concluded in a narrative report dated December 8, 2017 that:

> [Plaintiff's] conditions are chronic and permanent.  He has reached maximum medical improvement and further treatments, although needed for palliative and maintenance care, will not improve his condition.  It is my opinion that he is currently unable to work and is totally, 100% disabled.  He is to avoid carrying more than five pounds in an eight-hour day and should never attempt to lift or carry any weight greater than ten pounds.  He should avoid continuous sitting in an eight-hour day, and should get up and move around every fifteen minutes.  He should be restricted to no overhead lifting, pulling, carrying, or pushing as well as weight bearing activities or prolonged standing.  He should also avoid prolonged walking, as well as negotiating stairs.  He should have assistance with daily activities as needed.  He will continue to need lifelong medical care for his disabilities.  His prognosis is poor.

(*Id.* at 545.)

---

[17]  Dr. Silver also documented clinical findings during his treatment of Plaintiff.  Upon initial examination on October 16, 2015, Dr. Silver noted a positive straight leg raise ("SLR") test at 80 degrees bilaterally, a positive bilateral patellar grind test, and "grossly" decreased left ankle accessory motions.  (Tr. at 542.)  A positive SLR test bilaterally at 80 degrees was again documented on February 1, 2016 (*id.* at 550), February 1, 2017 (*id.* at 548), and May 31, 2017 (*id.* at 547).  A positive bilateral patellar grind test was again documented on February 1, 2016 (*id.* at 550), October 18, 2016 (*id.* at 549), February 1, 2017 (*id.* at 548), July 5, 2017 (*id.* at 547), May 31, 2017 (*id.*), and November 22, 2017 (*id.* at 546).  A treatment note from December 1, 2015 indicated "[g]ait w[ith] c[omplaint] o[f] knee discomfort, esp[ecially at] heel strike at extension." (*Id.* at 551.)  An "antalgic [gait]," i.e., "a posture or gait assumed so as to lessen pain," *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 559 n.1 (S.D.N.Y. 2013), was subsequently observed during examinations on November 2, 2015 (Tr. at 551), November 22, 2017 (*id.* at 548), and November 22, 2017 (*id.* at 546).  Dr. Silver also documented upon each of his thirteen examinations "significant [] spasm" across the lumbar muscles, gluteal muscles, and hamstring muscles, below functional active range of motion in both knees, sustained bilateral knee pain, low back pain, lower extremity numbness/tingling, and left ankle pain.  (*Id.* at 539–52.)  He confirmed Drs. Shebairo's, Goldstein's, and Clarke's diagnoses of status post bilateral patellar tendon repair due to rupture, multiple disk herniation, flat foot deformity, and chronic left ankle sprain.  (*Id.*)

Despite the extensive and consistent medical evidence from Plaintiff's treating physicians, the ALJ afforded "no weight" to Dr. Shebairo's opinion, "little weight" to Drs. Goldstein and Clarke's opinions, and "some weight" to Dr. Silver's opinion.[18]  (*Id.* at 20, 22–23.)  With respect to Dr. Shebairo, the ALJ concluded that his "recommendation for conservative treatment, predominantly limited to home exercise and strengthening, and Dr. Goldstein's identification of over-the-counter medication therapy, are not consistent with the subjective allegation of profound functional difficulties," especially since "neither Dr. Shebairo nor Dr. Goldstein prescribed an assistive device . . . for ambulation."  (*Id.* at 20.)  The ALJ afforded "little weight" to Dr. Goldstein's opinion because his purportedly conservative treatment "contradicts his opinion suggesting serious difficulties in standing and walking."  (*Id.* at 22.)  In affording "little weight" to Dr. Clarke's January 8, 2018 opinion, the ALJ again described a "lack of urgent response, of a recommendation of aggressive alternatives, or of more intensive treatment" as inconsistent with the functional limitations to which Dr. Clarke opined.  (*Id.* at 21.)  She discredited Dr. Clarke's January 8, 2018 opinion on the basis that it was "based on a [single] physical examination that is not representative of the longitudinal record."  (*Id.* at 23.)  Finally, the ALJ characterized Dr.

---

[18] The Court notes that the ALJ similarly discredited the findings of Plaintiff's chiropractor, Gary Cullin, D.C., who examined Plaintiff and administered chronic manipulation treatment ("CMT") to the lumbar spine twenty-five times between September 2, 2015 and December 5, 2017. (Tr. at 21, 528–38.)  Dr. Cullin also noted clinical findings (*id.* at 530–31) and characterized Plaintiff's symptomatology as "persistent" and "chronic" (*id.* at 528–38).  The Court notes that, although "[c]hiropractors are not accepted medical sources whose opinions are entitled to controlling or even special weight," *Maneri v. Berryhill*, No. 17-CV-322 (ADS) (GRB), 2019 WL 4253972, at *6 (E.D.N.Y. Sept. 9, 2019) (citation omitted), an ALJ "may not flatly reject them without explaining [her] basis for doing so," *Nigro v. Astrue*, No. 10-CV-1431, 2011 WL 4594315, at *5 (E.D.N.Y. Sept. 30, 2011) (citations omitted).  An ALJ has discretion to determine how much weight to give the opinions of a chiropractor, but "should consider the opinions" and "explain what weight he gives those opinions."  *Id.* (internal quotation marks and citations omitted).  In light of Dr. Cullin's extensive treating relationship with Plaintiff over the course of over two years, on remand, the ALJ is directed to appropriately consider and weigh Dr. Cullin's opinion.

Silver's opinion as "too restrictive" and therefore accorded it "only some weight." (*Id.* at 23.)  The ALJ provided only one reason in support of this conclusion, writing that "[t]his record contains insufficient substantial objective evidence of upper extremity weakness to support the limitations opined-to in lifting and carrying.  Indeed, only one isolated physical examination report from Dr. Silver suggested an antalgic gait: this observation is not reflected in the longitudinal treatment record." (*Id.*)

The Court finds that, to the extent the ALJ believed that Dr. Shebairo's opinions lacked an assessment of Plaintiff's functional limitations, she should have taken affirmative steps to further develop the evidentiary record, including consulting with Dr. Shebairo to obtain more information and resolve, if possible, any seeming inconsistencies or deficiencies in his treatment records.  As courts in this Circuit have held,

> the ALJ must make every reasonable effort to help an applicant get medical reports from his medical sources . . . [and] must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

*Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).  Furthermore, "while a treating physician's statement that the [plaintiff] is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand."  *Rocchio v. Astrue*, No. 08-CV-3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (alterations in original) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011); *see also Shaw v. Charter*, 211 F.3d 126, 134 (2d Cir. 2000).  Here, the ALJ rejected medical opinions without further developing the record, and specifically did not

consider Dr. Shebairo's opinion on the basis that it lacked an assessment of Plaintiff's functional abilities, without inquiring further.

Second, the "conservative" nature of a treating physician's treatment does not constitute a sound justification for the wholesale rejection of his or her opinion. *See Burgess*, 537 F.3d at 129 ("Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen." (citation omitted)). "The ALJ . . . may not impose [her] [] notion[] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered. A circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." *Id.* (internal quotation marks, citations, and alterations omitted). Here, the ALJ improperly justified her rejection of Dr. Shebairo's opinion and partial rejection of Drs. Goldstein and Clarke's opinions by citing their purportedly conservative approaches to treatment without explaining how any such methods as "home exercise" and "over-the-counter medication therapy" (Tr. at 20–21) are inconsistent with or contradictory to the functional limitations to which all of these physicians opined. *Cf. Shaw*, 221 F.3d at 134 (finding that a treating physician's recommendation of "only conservative physical therapy, hot packs, EMG testing—not surgery or prescription drugs" was not substantial evidence that plaintiff was not physically disabled); *see also Ridge v. Berryhill*, 294 F. Supp. 3d 33, 60 n.12 (E.D.N.Y. 2018) ("To the extent the conservative nature of plaintiff's treatment was a key factor [in] the ALJ's conclusion, the Court finds that would be an insufficient basis for finding plaintiff was not disabled in light of the entire record." (citation omitted)). Moreover, the ALJ failed to consider how Plaintiff's "lack" of "aggressive" or "urgent" treatment was actually an indication of the severity, if not irreversibility or untreatable nature, of his physical impairments. (Tr. at 21.) As discussed above, with respect to Plaintiff's treatment and prognosis,

Dr. Silver opined that Plaintiff "has reached *maximum* medical improvement and further treatments, although needed for palliative and maintenance care, will not improve his condition." (*Id.* at 545 (emphasis added).)  Finally, to the extent that the ALJ characterized as "conservative" Drs. Shebairo's, Goldstein's, and Clarke's treatment on the basis that none of them prescribed an assistive ambulatory device, she improperly "substitute[d] [her] own expertise or view of the medical proof for the treating physician's opinion." *Greek*, 802 F.3d at 375 (citation omitted).

Third, the ALJ failed to justify her conclusion—which appears to flatly contradict the record—that neither Dr. Silver's nor Dr. Clarke's treatment notes are reflective of the longitudinal record.  (Tr. at 23.)  Dr. Clarke, who treated and examined Plaintiff sixteen times over the course of thirty months, opined in a 2018 narrative report that "[a]ll submitted documentation chronicles a steady decline in functionality." (*Id.* at 151.)  Indeed, his own findings remained consistent over time, regularly noting "[l]umbar paraspinal musculature is tender and in spasm.  Significant straightening of the normal lumbar lordosis. . . .  Flexion and extension against resistance are painful . . . diffuse swelling . . . moderate swelling" of the left ankle, positive SLR test, positive McMurray's test, and multiple disk herniations.  (*Id.* at 151–57, 161–93.)  Likewise, Dr. Silver's treatment records documented limited range of motion, widespread muscle spasm, back pain, knee pain, and ankle pain, all of which contributed to the doctor's assessment that Plaintiff was severely functionally limited with respect to both his upper and his lower body  (*Id.* at 545.)  The ALJ similarly discredited Dr. Clarke's narrative report summarizing his cumulative findings because it was "based on a physical examination that is not representative of the longitudinal record." (*Id.* at 23.)  Yet, Dr. Clarke's report was in fact based on 30 months' worth of his own treatment notes, examinations, review of MRIs, and review of the record as a whole.  (*Id.* at 152.)  The ALJ likewise dismissed Dr. Silver's opinion on the basis that only one observation of an antalgic gait did not

16

suffice to substantiate the upper body limitations to which Dr. Silver opined.  (*Id.* at 23.)  But the ALJ did not explain how this finding, or lack thereof, contradicted any of the functional limitations in carrying or lifting assessed by Drs. Silver and Clarke, a legal error warranting remand.  *See Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) ("Federal courts reviewing administrative social security decisions decry 'cherry picking' of relevant evidence, which may be defined as inappropriately crediting evidence that supports administrative conclusions while differing evidence from the same source.") (collecting cases).

In contrast, the ALJ accorded "great weight" to the opinion of Dr. Roopalekha Shenoy, M.D., the consultative examiner, because it was "supported by [her] independent medical examination, and [was] not substantially contradicted by the contemporary treatment record."  (*Id.* at 24.)  Dr. Shenoy, however, conducted a single examination of Plaintiff on December 10, 2015, during which she observed "slow, but normal" gait, full flexion of the cervical spine, hips, and knees, and stable joints.  (*Id.* at 425–26.)  She opined to "no limitation in sitting[, m]ild to moderate limitation in prolonged standing, climbing, walking, pulling, pushing, and carry[ing] heavy objects secondary to [Plaintiff's] knee disorder and back pain," and to limited exposure to "dust, extremes in temperature, and respiratory irritants secondary to the asthma."  (*Id.* at 427.)

The ALJ's decision in this case to assign "great weight" to the consulting examiner's opinions is grossly inconsistent with the case law in this Circuit, which strongly discourages ALJs from "rely[ing] heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419 (citation omitted); *see also Murphy v. Saul*, No. 17-CV-1757 (PKC), 2019 WL 4752343, at *3 (E.D.N.Y. Sept. 30, 2019) ("[C]onsultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990))).

17

Despite acknowledging that Plaintiff's treating physicians "opined to marked or even extreme physical difficulties," which, "[t]aken together . . . suggest[] that the claimant is unable to bear weight, cannot perform prolonged standing or walking, or cannot climb stairs" (Tr. at 23–24), the ALJ nonetheless discredited these opinions on the basis that they were inconsistent with the "great weight" of "the longitudinal objective medical records" (*id.* at 23). This finding is almost nonsensical. Indeed, in arriving at this conclusion, the ALJ failed to identify any medical evidence in the record that contradicts the opinions of Plaintiff's treating physicians. Rather than pointing to substantial medical evidence in the record to support her RFC, the ALJ selectively plucked from various treatment notes adjectives which served to minimize the severity of Plaintiff's physical limitations, such as "mild" weakness and "good" mobility. At the same time, the ALJ erred by failing to consider or even acknowledge the consistent and abundant medical evidence in the record supporting Plaintiff's claim of disability, including the findings of Plaintiff's persistent limited range of motion starting with his orthopedic surgeon and continuing through his three treating physicians and chiropractor, and the MRIs documenting chronic spinal, knee, and ankle injuries. *See Ellis v. Astrue*, No. 09-CV-4333 (DLI), 2011 WL 1240103, at *9 (E.D.N.Y. Mar. 30, 2011) ("An ALJ must acknowledge all evidence that supports a claim of disability and, if she concludes otherwise, she must explain why the pertinent evidence does not justify the result sought by the claimant. Furthermore, although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, we cannot accept an unreasoned rejection of evidence that supports [the] plaintiff's position." (internal quotation marks, alterations, and citations omitted)).

In sum, the record makes clear that the ALJ, inexplicably, strained to maneuver around the substantial and sustained record evidence demonstrating Plaintiff's significant and irreversible physical limitations to find that Plaintiff was not disabled within the meaning of the Act. For all

these reasons, the Court finds that the ALJ's findings, based on an improper assignment of weight to the medical opinions in the record, was not supported by substantial evidence, and that remand is therefore necessary.

## II.    The CDI Report

The Court also finds that the ALJ erred in relying on a report by the Cooperative Disability Investigations Unit ("CDI") of the SSA[19] (Tr. at 18), which is composed of non-medical evidence, to reach conclusions about Plaintiff's activities of daily living and to undercut the opinions of Plaintiff's treating physicians.

CDI investigators surveilled Plaintiff three times, for approximately three hours each time, between November 13 and December 10, 2015.  (*Id.* at 451–53.)  Investigators conducted this surveillance from an unmarked vehicle stationed outside of Plaintiff's residence and without Plaintiff's knowledge.  (*Id.*)  They followed Plaintiff by car from his home as he carried out basic daily activities, such as walking to a nearby park and going to the bank.  (*Id.*)  These observations, according to the ALJ, "provide[] at least some evidence of residual strength and mobility that is consistent with a reduced range of light work."  (*Id.* at 22.)

The ALJ's use of non-medical, observational evidence from the CDI report to discredit the opinions of Plaintiff's treating physicians was error.  *See Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL 1599944, at *11 (E.D.N.Y., Apr. 21, 2014) ("[The CDI] report is not medical evidence.").  For example, the ALJ concluded that Plaintiff was capable of bearing weight, prolonged standing and walking, and climbing stairs based on the investigators' one-time

---

[19] The CDI "investigate[s] disability claims . . . that State disability examiners believe are suspicious.  The CDI program's primary mission is to obtain evidence that can resolve questions of fraud before benefits are ever paid."  *Cooperative Disability Investigations,* Office of the Inspector General, Social Security Administration, https://oig.ssa.gov/cooperative-disability-investigations-cdi (last visited Sept. 24, 2020).

observation of him "stand[ing] on one leg, ostensibly to stretch his knee and quadriceps, with only holding onto a fence for support." (Tr. at 23.) The ALJ further cited "observations in the surveillance report describing apparent intact strength and mobility" as justifying her RFC determination of light work. (*Id.* at 24.) However, "the ALJ has not adequately explained how this evidence of lay opinion based on three [partial days] of surveillance can overcome the medical opinions in the record." *Holliday v. Colvin*, 195 F. Supp. 3d 1192, 1204 (D. Kan. 2016).

Notably, none of Plaintiff's activities observed by CDI investigators—walking short distances without an ambulatory device, stretching his legs, sitting upright in a chair, filling out paperwork, entering and exiting a motor vehicle without assistance, and walking up the few steps to his front door without use of a handrail—contradict the findings of Drs. Goldstein, Silver, or Clarke that Plaintiff cannot lift/carry more than ten pounds, sit less than four-to-six hours, and stand/walk less than two hours in an eight-hour workday. (*Id.* at 22–23.) The ALJ's interpretation of the CDI report as evidence supporting an RFC determination of light work was thus erroneous, as CDI reports cannot be taken as proof that a plaintiff can perform light work. *See Glessing*, 2014 WL 1599944, at *11 (remanding in part because the ALJ improperly considered a CDI's report of plaintiff's daily activities to "form the basis of an RFC determination"). Furthermore, "an individual can perform each of these daily activities and still experience debilitating pain at the intensity and persistence and with the limiting effects he claims." *McGill v. Saul*, No. 18-CV-6430 (PKC), 2020 WL 729774 at *7 (E.D.N.Y. Feb. 13, 2020) (internal quotation marks, alterations, and citation omitted). "The Second Circuit has repeatedly recognized that 'a claimant need not be an invalid to be found disabled.'" *Colon v. Astrue*, No. 10-CV-3779 (KAM), 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)). "Indeed, it is well-settled that the performance of basic daily activities does not

20

necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Cabibi v. Colon*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) (internal quotation marks and citations omitted).

Accordingly, the Court finds that the ALJ committed reversible error in relying on the CDI report over the opinions of Plaintiff's treating physicians to support her RFC determination.

## CONCLUSION

For the reasons contained herein, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this order. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 25, 2020
      Brooklyn, New York